


UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | | |
|---|---|---|
| **VAN BUREN LODGING, LLC,** a South Dakota and New York limited liability company,<br><br>**Plaintiff,**<br><br>v.<br><br>**WINGATE INNS INTERNATIONAL, INC.,** a Delaware corporation,<br><br>**Defendant.** | ) | **Court File No.** CV-10-1016<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. At the heart of this dispute, Wingate Inns International, Inc. ("Wingate") oversold Van Buren Lodging, LLC ("Van Buren") on its hotel franchise by making a host of material misrepresentations (and omissions), which Van Buren only learned were false after it entered into the Franchise Agreement and operated its hotel. The misrepresentations related to important financial performance metrics in the hotel industry, including what Wingate could expect its revenue per available room ("RevPar") to be. Wingate also misrepresented the number of Wingate hotels that were open and operating, along with making projections regarding growth that lacked a reasonable basis.

2. Furthermore, when Van Buren was not reaching the financial metrics that Wingate represented it would, Wingate failed to meet both its contract-in-fact and contract-in law obligations to provide the requisite training and support.

3. Despite Wingate's long-standing written and verbal policy that allows its franchisees to terminate their franchise agreement with 60 days' advance notice, and without

paying liquidated damages, so long as the franchisees meet certain criteria (which criteria Wingate must determine whether franchisees are meeting consistent with their obligations to exercise their discretion reasonably), Wingate refused to let Van Buren terminate its Franchise Agreement unless it paid Wingate hundreds of thousands of dollars in liquidated damages.

## II. PARTIES & JURISDICTION

4. Plaintiff, Van Buren Lodging, LLC, is a South Dakota and New York limited liability company because the citizenship of a limited liability company is determined by the citizenship of all four of its members: Jacob Wright, Judy Bledsoe, Kevin Krank, and Steve Warren. Jacob Wright resides at 109 South Warren Street, Suite 1300, Syracuse, New York, 13202. Judy Bledsoe resides at 1312 N. Arch Street, Aberdeen, South Dakota, 57401. Kevin Krank resides at 485 South Sunset Drive, Mina, South Dakota, 57451. Steve Warren resides at 1425 18th Ave NE, Aberdeen, South Dakota, 57401.

5. Van Buren's headquarters are located at 506 South Wilson Street, Aberdeen, South Dakota.

6. Van Buren entered into a Franchise Agreement with Wingate on or about November 8, 2005 for a Wingate Inn hotel located at 6846 Winchell Road, Warners, New York 13164. Van Buren opened its Wingate in October of 2006. In order to mitigate its damages, which are approximately $2,700,000, on or about December 1, 2009, Van Buren discontinued its operations as a Wingate Inn and subsequently rebranded to a Holiday Inn Express.

7. Defendant, Wingate Inns International, Inc. is a corporation organized under the laws of Delaware, with a principle place of business at 1 Sylvan Way, Parsippany, New Jersey, 07054. Wingate is a wholly-owned subsidiary of Cendant Hotel Group, Inc. ("Cendant").

8. This court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332. Van

Buren Lodging and Wingate Inns are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court, because a substantial part of the events giving rise to this claim occurred in this District.

10. This Court has personal jurisdiction over Wingate because Wingate conducted and continues to conduct substantial business in the State of South Dakota. Additionally, this Court has personal jurisdiction over Wingate because this cause of action arises out of Wingate's continuous and substantial contacts with the State of South Dakota.

## III. LAWS REGULATING THE SALE OF FRANCHISES

***--The Inception of Franchise Regulation***

10. In the 1950's and 1960's, modern franchising took off as a method of doing business, but was unregulated and subject to widespread abuse. State and federal regulators began to study the situation in the late 1960's and concluded that the sale of franchises was similar to the unregulated sale of securities in the 1920's. Accordingly, in 1979, the Federal Trade Commission ("FTC") adopted a trade regulation rule governing the sale of franchises that is roughly modeled on the SEC Act. 16 CFR Part 436 (the "FTC Franchise Rule"). The FTC Franchise Rule requires a franchisor to provide a prospective franchisee with certain disclosures, contained in a written offering circular, or prospectus, prior to the purchase of the franchise. Certain states, including South Dakota, have parallel legislation, and provide franchisees with the right to rescind the franchise agreement and civil remedies if a franchisor, or its principals, fail to make the required disclosures, or make misleading statements or omissions in connection with a franchise sale. *See* S.D. Codified Laws § 37-5A-1 *et seq.* subsequently replaced by 2008 S.D. Sess. Laws ch. 203, § 51), *et seq*.

***--The Franchisor's Disclosure Obligations***

11. The franchisor's disclosure obligations to prospective franchisees under federal and state law may be satisfied by providing the prospective franchisee with an offering circular known (at the relevant time) as the Uniform Franchise Offering Circular ("UFOC"). The disclosure obligations are contained in the UFOC Guidelines, a standard set of Guidelines adopted by the FTC, South Dakota, and New York for franchise disclosure.[1]

12. The UFOC Guidelines require a franchisor to make disclosure with respect to 23 different "Items" of information, including the nature of the franchise; the principals who own and run it; the costs of obtaining or operating the franchise; the existence of litigation in which the franchisor has been involved; the material terms of the contract; the existence of other franchisees and their locations; and, if the franchisor chooses to provide information on the financial performance of its outlets, a fair presentation of those figures, and the factual bases therefore.

***--UFOC Item 19***

13. Item 19 of the UFOC Guidelines defines an **earnings claim** broadly as:

> information given to a prospective franchisee, by, on behalf of or at the direction of the franchisor or its agent, from which a specific level or range of actual or potential sales, costs, income or profit from franchised or non-franchised units may easily be ascertained.[2]

14. Under Item 19 of the UFOC Guidelines, a franchisor is under no obligation to make an earnings claim. If, however, the franchisor does make an earnings claim, it must do so only in compliance with Item 19's requirements.

---

[1] *See* S.D. Cent. Code s 37-5A-30 (allowing franchisors to provide franchisees with a disclosure document "which complies with the requirements of any federal law or administrative rule ... requiring substantially the same disclosure of information as is required by this chapter").

[2] UFOC Guidelines, Bus. Franchise Guide (CCH) ¶ 5771 (Item 19).

15. In order to be lawful, the UFOC Guidelines provide that an earnings claim must:

- Be physically included in Item 19 of the UFOC;
- Have a reasonable basis at the time it is made;
- Include a description of the factual basis underlying its preparation and presentation.[3]

16. Notably, the burden is on the franchisor to prove that it had a reasonable basis for making an earnings claim.[4]

17. The UFOC Guidelines provide that the earnings claim disclosure in Item 19 must also state:

a. a description of the material assumptions, other than matters of common knowledge, underlying the claim;

b. a concise summary of the basis for the claim, including a statement of whether the claim is based upon actual experience of franchised units and, if so, the percentage of franchised outlets in operation for the period covered by the earnings claim that have actually attained or surpassed the stated results;

c. a conspicuous admonition that a new franchisee's individual financial results are likely to differ from the results stated in the earnings claim; and

d. a statement that substantiation of the data used in preparing the earnings claim will be made available to the prospective franchisee on reasonable request.[5]

## IV. FACTUAL CHRONOLOGY

40. Kevin Krank, a member of Van Buren, is an owner of Hospitality Builders, Inc. ("Hospitality Builders"). Hospitality Builders constructs hotels and other commercial buildings.

---

[3] Bus. Franchise Guide (CCH) ¶ 5771.

[4] *Id.*

[5] *Id.*

As part of his work with Hospitality Builders, Kevin Krank would frequently deal with different hotel opportunities and, at times, even team up with hotel franchisors when sales presentations were made to prospective franchisees. The franchisor would "sell" the franchise opportunity, and Krank would offer construction services to build the hotel.

41. Over the years, Krank became familiar with John Dodsworth, an employee of Wingate who worked in franchise sales. After sitting through many sales presentations, Krank became interested in actually being part owner of a Wingate Inn himself.

42. In early 2004, Dodsworth introduced Krank to Mohan Kaura, who was working with Wingate to construct a Wingate Inn in Clay, New York. After meeting, Krank and Kaura became partners to try to develop an eight acre site that Kaura had in Clay, New York. However, after conducting due diligence, Krank and Kaura discovered that most of the site was wetlands and could not be developed. Thereafter, Krank and Kaura went their separate ways.

43. After the Clay location fell through, Wingate allowed Krank to transfer the deposit that he put down to a deposit for another location. At or about this time, Krank decided to pursue a Wingate Inn, but with other partners, including Jacob Wright, Judy Bledsoe, and Steve Warren through their limited liability company, Van Buren Lodging, LLC.

***--The Dodsworth Presentation***

44. As far back as the spring of 2004 and as late as the fall of 2006, Krank sat in on Dodsworth's presentations to prospective franchisees and, along with other information provided by Wingate, is one of the reasons that he and his partners decided to become a Wingate franchisee.

45. During the presentations, Dodsworth discussed what Wingate hotel's average RevPar and ADR numbers allegedly were. Mathematically, ADR, or average daily rate, is

simply gross room revenue divided by the number of occupied guest rooms. Mathematically, RevPar, or revenue per available room, is average occupancy rate multiplied by average daily rate.

46. During his presentations, Dodsworth would explain that RevPar is one of the primary metrics or tools used to measure a hotel's financial performance. Prior to Van Buren entering into the Franchise Agreement, during a presentation in or about 2005, Dodsworth stated that Wingates, on average, experience a RevPar of $55.00 to $58.00. He also stated that if a Wingate hotel was operating correctly, it should have an ADR of $90.00 to $109.00.

47. Dodsworth also claimed that Wingate was on track to have a total of 250 hotels in the United States by the end of 2006. A franchise system's number of hotels is extremely important in any system, but particularly, hotel franchise systems. That is because, amongst other things: (1) it helps to promote brand awareness, which, in turn, drives occupancy and revenue, and (2) hotel customers, especially business travelers, tend to be very loyal to their hotel brand because they can collect hotel points or rewards to use for their future business or leisure travel. In order for a traveler to choose a certain brand that he or she will typically be loyal to, the brand has to have enough locations and presence across the United States to make it possible for the traveler to find a hotel within that system in order to collect these frequent guest/traveler rewards points.

***--Wingate's UFOC: Item 19***

48. In addition to the oral presentations by Dodsworth, Wingate also provided Van Buren with a UFOC, which was issued March 30, 2004 and amended as of February 17, 2005.

49. In Item 19 of its UFOC, Wingate made an affirmative earnings claim. [Item 19 of Wingate's UFOC is attached hereto as **Exhibit A**.] However, Wingate's Item 19 disclosure

provided misleading information. For example:

- It provided RevPar, ADR and average occupancy rates ***only*** for its hotels that had been in operation for the entire period of October 1, 2003 to September 30, 2004. This is inherently misleading because, without explicitly acknowledging or explaining it, the earnings claim excluded all of the franchisees that had exited the system within the prior year (and therefore were not open for a full year), a vast majority of which likely exited based on poor financial performance. By excluding the worst performing franchisees in the system, and without disclosing this fact, RevPar numbers were artificially inflated.
- Furthermore, the figures exclude any hotel who failed its last quality assurance inspection, which is largely subject to Wingate's exercise of discretion whether a franchisee passes or fails. In order to get a sense of the number of franchisees excluded from the earnings claim information using Wingate's selection criteria, Exhibit F-1 to Wingate's UFOC claims that it had 254 hotels open and operating, yet the earnings claim only has information for 117 hotels. [A copy of Exhibit F-1 from the UFOC is attached as **Exhibit B**.]
- Finally, Wingate's Item 19 provided RevPar, ADR and average occupancy rates broken down by region. The Northeast region, which includes New York—where Van Buren's hotel was to be located, allegedly had the highest RevPar, ADR and "***average***" occupancy rates. However, the disclosure was misleading because it provided the mean, ***rather than the median***, to demonstrate a typical Northeast franchisee's RevPar, ADR and average occupancy rates. Upon information and belief, using the mean was misleading because of mathematical "outliers." For

example, based upon information and belief, the Wingate hotel in New York City had a significantly higher RevPar, ADR and average occupancy rate than the other hotels within the Northeast region, again significantly skewing the data provided for the eight Wingate hotels in the Northeast region. The UFOC claimed that the average RevPar for the eight franchisees in the Northeast was $64.41; with an ADR of $91.91; and an average occupancy rate of 70.08%.

- Apart from the misleading earnings claim information, as noted above, Exhibit F-1 claimed that there were 254 Wingate Inns that were "open and operating." However, that representation was simply a lie. Van Buren has knowledge that at least eight of the hotels listed as "open and operating" were ***never even built***, including hotels in Colorado Springs, Colorado; Hamden, Connecticut; Ann Arbor, Michigan; Hooksett, New Hampshire; North Conway, New Hampshire; Clay, New York; Harriman, New York; and Vestal, New York. It is likely that many more were never "open and operating" as Wingate represented they were.

50. In reliance upon the information provided by Dodsworth along with Wingate's UFOC, Van Buren entered into a Franchise Agreement with Wingate on November 8, 2005 for a location in Warners, New York 13164. [Attached as **Exhibit C** is a copy of the Franchise Agreement.]

51. After entering into the Franchise Agreement, Van Buren also entered into a "Development Incentive Note," for the sum of $198,000. In essence, Wingate provided approximately $198,000 in funding as an incentive for Van Buren to build the hotel, with an understanding that if the hotel remained open for 15 years, a zero balance would be due—*i.e.*, on each anniversary of the hotel's opening date, one-fifteenth of the original principal amount

would be forgiven without payment.

52. Van Buren subsequently opened its Wingate Inn for business in October, 2006. After suffering over $1.2 million in operating losses alone (not including depreciation and the initial investment in the hotel), Van Buren sought to terminate its relationship with Wingate without payment of liquidated damages, pursuant to Cendant's long-standing policy of allowing franchisees to do so.

53. [Attached hereto as **Exhibit D** is a copy of Cendant/Wingate's long-standing policy to allow franchisees to close without penalty or payment of liquidated damages.]

54. The policy provides that Cendant/Wingate:

> Permits a franchisee to terminate an agreement without penalty or payment of liquidated damages with 60 days advance written notice provided certain clearly delineated conditions are met. These conditions include:
>
> - The franchisee has been operating with a fully executed agreement for at least two years;
> - The franchisee has attained an occupancy rate of less than 50%--a rate lower than that determined by leading industry analysts to be the "break-even" point for a hotel for any one-year period after the end of the first two years of operation;
> - The franchisee has participated in all mandatory national and regional marketing programs of the hotel brand, and has successfully completed all required training courses;
> - The franchisee has maintained the brand average quality assurance score and is current with royalty payments.

55. Van Buren was also told orally about this policy, both before and after entering into the Franchise Agreement, by employees of Wingate and relied on this policy when deciding to enter into the Franchise Agreement.

56. On or about February 11, 2009, Van Buren, through its attorney, provided Wingate with written notice that it wished to terminate its Franchise Agreement. Up until that

point, the hotel had been open since October 2006, had consistency experienced an occupancy rate of less than 50%, had participated in the required marketing programs and completed the requisite training (to the extent that Wingate would actually provide the training) and had never failed a quality assurance inspection. While, due to the poor financial performance of the hotel, Wingate had fallen behind on royalties, in connection with its request to terminate its Franchise Agreement, it made a proposal to become current with its past due royalty payments.

57. Just two days later, on February 13, 2009, Van Buren received its first failing quality assurance score. Upon information and belief, Wingate purposefully failed Van Buren so that Wingate could attempt to collect liquidated damages from Van Buren, pursuant to Paragraph 12.1 of the Franchise Agreement.

58. Despite Van Buren's request, and in violation of its own long-term policy, Wingate refused to allow Van Buren to terminate its Franchise Agreement with Wingate unless it paid liquidated damages.

59. Left with no choice, and in order to mitigate its damages, Van Buren ceased operating as a Wingate Inn on or about December 1, 2009.

**THE FALSITY OF DEFENDANT'S REPRESENTATIONS**

60. Van Buren never achieved the RevPar and average occupancy rates that Wingate represented it could expect to achieve, and upon information and belief, the "average" provided, *i.e.*, average RevPar of $55.00 to $58.00, was simply false at the time it was provided.

61. Van Buren's RevPar figure for 2007 was $28.06; for 2008 it was $41.81; and for 2009 it was $39.64. Van Buren's occupancy rate did not come anywhere near the "average" occupancy rate for Wingate Inns in the Northeast region (70.08%). Van Buren's occupancy rate for 2007 was 30%; 45% for 2008; and 43.3% for 2009,

62. Similarly, Wingate's projection of 250 hotels in the United States by the end of 2006 never happened. As a matter of fact, at the end of 2006, Wingate only had 152 facilities in the United States.

63. Had Wingate properly and lawfully disclosed the franchise opportunity, Van Buren would never have entered into a Franchise Agreement with Wingate.

**COUNT I**
**VIOLATION OF THE SOUTH DAKOTA FRANCHISE ACT**
**S.D. CODIFIED LAWS § 37-5A-1, ET SEQ.**

Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

63. The South Dakota Franchise Act ("South Dakota Act") applies because Wingate directed its offer to sell a franchise to Van Buren in South Dakota by, amongst other things, sending its Franchise Agreement to South Dakota, which is where Van Buren executed (and accepted) the Franchise Agreement.

64. The South Dakota Act defines a franchise as a "contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons":

(1) By which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol of related characteristics;

(2) In which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement or otherwise; and

(3) For which the franchisee is required to pay, directly or indirectly, a franchise fee.

S.D. Codified Laws § 37-5A-1.

65. The relationship between Van Buren and Wingate satisfies each of these elements and constitutes a franchise as: (1) Van Buren was granted the right to use Wingate's trademark, service mark, trade name and other trademarks and rights; (2) Van Buren and Wingate had a community of interest, due to both parties profiting from a common source; and (3) Van Buren paid Wingate a franchise fee and ongoing royalties.

66. While the Franchise Agreement contains a New Jersey choice-of-law clause, the South Dakota Act provides that "[a]ny condition, stipulation or provision purporting to waive compliance with any provision of this chapter or any rule or order thereunder is void." S.D. Codified Laws § 37-5A-86. The New Jersey choice-of-law clause, therefore, did not, and does not, relieve Wingate of its obligation to comply with the provisions of the South Dakota Act.

67. Section 37-5A-26 of the South Dakota Act states that "a copy of any statement of estimated or projected franchisee earnings prepared for presentation to prospective franchisees … together with a statement setting forth the data upon which such estimation or projection is based, shall be submitted with the public offering statement." S.D. Codified Laws § 37-5A-26.

68. Prior to signing the Agreement, as noted above, on behalf of Wingate, Dodsworth provided Van Buren with specific information regarding RevPar, ADR, and average occupancy rates. These oral representations were not presented in connection with a public offering statement—*i.e.*, a UFOC, and as a matter of fact, were different than the information contained in the UFOC.

69. Wingate violated § 37-5A-26, along with other provisions of the South Dakota Act, by: (1) providing these projections outside of the UFOC; and (2) failing to disclose a sufficient factual basis (or actually having one) for the projections, along with the material assumptions underlying the information.

70. Section 37-5A-42 of the South Dakota Act provides that:

> No person may offer or sell a franchise in this state by means of any written or oral communication which includes an untrue statement of material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

S.D. Codified Laws § 37-5A-42.

71. Wingate, in connection with its offer and sale of the franchise to Van Buren, made untrue statements of material fact and omitted information necessary to make other statements made not misleading, such as:

- Wingates, on average, experience RevPar of $55.00 to $58.00.
- Wingate was on track to have a total of 250 hotels in the U.S. by the end of 2006.
- Van Buren would be allowed to terminate its Franchise Agreement, without having to pay liquidated damages, consistent with Wingate's long-standing policy, if Van Buren reasonably met the criteria.

72. Further, as described in detail above, Wingate made a host of misleading statements and material omissions in its actual UFOC—*e.g.*, excluding some of the lowest financially performing franchisees from its earnings claim.

73. Van Buren reasonably relied upon the above referenced statements in deciding to enter into the Franchise Agreement. Van Buren would not have invested in or entered into the Franchise Agreement with Wingate had all of the relevant information regarding the franchise opportunity been properly and truthfully disclosed to Van Buren prior to it signing the Franchise Agreement.

74. Section 37-5A-83 of the South Dakota Act provides that "[a] person who violates any provision of §§ 37-5A-1 to 37-5A-50, inclusive and 37-5A-52 to 37-5A-86, or any rule or order thereunder shall be liable to the franchisee … who may sue for damages caused thereby,

for rescission, or other relief as the court may deem appropriate." S.D. Codified Laws § 37-5A-83.

75. Furthermore, Section 37-5A-85 of the South Dakota Act states that "[a]ny suit authorized under § 37-5A-83 may be brought to recover the actual damages sustained by the plaintiff together with costs and disbursements plus reasonable attorneys' fees, and ***the court may in its discretion increase the award of damages to an amount not to exceed three times the actual damage sustained.***" S.D. Codified Laws § 37-5A-85 (emphasis added).

76. As a direct and proximate result of Wingate's violations of the South Dakota Act, Van Buren has suffered damages and is entitled to recover those damages from Wingate, in an amount to be determined at trial, trebled, together with costs, disbursement and attorneys' fees.

77. Moreover, Van Buren is entitled to rescission of its Franchise Agreement and all related agreements, including the Development Incentive Note.

**COUNT II**
**BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Plaintiff realleges the preceding paragraphs as if fully set forth herein.

78. In the event that the Court does not rescind the parties' Franchise Agreement and declare it null and void, Van Buren alternatively alleges that Wingate's actions constitute a breach of contract of the implied covenant of good faith and fair dealing.

79. In every contract, by operation of law, there is an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade. The implied covenant also prohibits either party from engaging in any conduct or in doing anything that deprives the other party of the fruits of the agreement or benefit of the bargain. The implied covenant requires

Wingate to act reasonably in the performance of its duties, and, among other things, refrain from engaging in conduct that would cause Plaintiff to operate at a loss or to take actions that would cause Van Buren's business to fail.

80. Under Paragraphs 4.1 and 4.13 of the Franchise Agreement, Wingate had a duty to provide Van Buren with on-site opening training.

81. Despite such requests for on-site opening training, Wingate materially breached its contractual obligations by failing to provide on-site opening training, leaving the hotel open to a poor start from the beginning.

82. Further, Wingate is breaching its oral and written policy (which amended the terms of the Franchise Agreement related to liquidated damages) and the implied covenant of good faith and fair dealing by engaging in wrongful conduct and abusing its discretion in an attempt to make Van Buren fall outside the scope of the policy, as well as by trying to collect liquidated damages for termination of the Franchise Agreement by Van Buren.

83. As a direct and proximate result of Wingate's conduct, Van Buren has been damaged in an amount which significantly exceeds $75,000. The precise amount of damages will be demonstrated at a trial on the merits.

**COUNT III**
**UNJUST ENRICHMENT**

Plaintiff realleges the preceding paragraphs as if fully set forth herein.

84. The conduct by which Wingate induced Van Buren to serve as a franchisee and to make substantial investments of time and money in reliance on Wingate's unjustified representations to Van Buren constitutes unjust enrichment.

85. The amount of damages by which Wingate has been unjustly enriched, and the amount which Van Buren is, or will be, entitled to recover cannot now be exactly determined.

Such damages are alleged to significantly exceed $75,000, and will be fully demonstrated at a trial on the merits.

**COUNT IV**
**INTENTIONAL MISREPRESENTATION**

Plaintiff realleges the preceding paragraphs as if fully set forth herein.

86. As described *supra*, Wingate falsely represented material facts (*e.g.*, the average RevPar of Wingate hotels *etc.*), and omitted material facts that were necessary in order to make the representations not misleading, with the intent to induce Van Buren to act on the information in purchasing its franchise.

87. The conduct by which Wingate induced Van Buren to serve as a franchisee and to make substantial investments of time and money in reliance on Wingate's unjustified representations to Van Buren constitutes fraud.

88. The above-described statements made by Wingate's representative, in order to induce Van Buren to invest in a Wingate franchise, were both false and willfully made with knowledge of their falsity at the time they were made.

89. Van Buren reasonably relied on Wingate's representations and has been damaged by the fraud perpetrated by Wingate

90. The amount of damages which Van Buren is entitled to recover cannot now be exactly determined. Such damages are alleged to significantly exceed $75,000, and will be fully demonstrated at a trial on the merits.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**

Plaintiff realleges the preceding paragraphs as if fully set forth herein.

91. Wingate owed Van Buren a duty to use reasonable care in making representations

that it knew Van Buren was relying upon.

92. Wingate owed Van Buren a duty of care because it was supplying information for the guidance of Van Buren in a transaction in which it had a pecuniary interest and was in the course of its business.

93. Wingate breached its duty of reasonable care by negligently supplying false and misleading information (or omitting material facts), which Van Buren reasonably relied on.

94. As a direct and proximate result of Wingate's conduct, Van Buren has been damaged in an amount which significantly exceeds $75,000 dollars. The precise amount of damages will be demonstrated at a trial on the merits.

**COUNT VI**
**DECLARATORY JUDGMENT**

Plaintiff realleges the preceding paragraphs as if fully set forth herein.

95. Van Buren requests that this Court enter declaratory judgment consistent with the foregoing, including:

96. Due to Wingate's violation of the South Dakota Franchise Act, intentional and negligent misrepresentation and/or material breaches of the Franchise Agreement and implied covenant of good faith and fair dealing, Van Buren is entitled to rescission of the Franchise Agreement in its totality and all related agreements, including the Development Incentive Note.

97. Alternatively, if this Court finds that Van Buren is not entitled to rescission, that Van Buren has met Wingate's policy for closure without paying liquidated damages, such that none shall be due.

**DEMAND FOR JURY**

1. Van Buren demands a jury trial.

**PRAYER**

**WHEREFORE**, Van Buren respectfully requests the following relief:

1. Award Van Buren its full amount of actual damages;

2. Award Van Buren rescission damages in the amount of its investment in the Wingate brand franchise;

3. A declaratory judgment granting Van Buren rescission of any contractual relationship with Wingate, including, but not limited to the Franchise Agreement and Development Incentive Note;

4. A declaratory judgment relieving Van Buren of any purported obligation to pay liquidated damages in connection with the termination of its Franchise Agreement;

5. Award Van Buren its complete costs, disbursements and reasonable attorneys' fees incurred herein, to the extent authorized under applicable law, including treble damages; and

6. Award Van Buren such other and further relief as the Court may deem just and appropriate.

Dated: 6.15, 2010.

**DADY & GARDNER, P.A.**

By: ______________________
J. Michael Dady (SD #337)
5100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
PH: 612-359-9000
FX: 612-359-3507
jmdady@dadygardner.com

**ATTORNEYS FOR PLAINTIFF**